Curran vs. A. H. Stange Co.

CURRAN, Respondent, vs. A. H. STANGE COMPANY, Appellant.

*February 12 — March 1, 1898.*

*Master and servant: Injuries to carriage rider in sawmill: Incompetent
sawyer: Promise to change: Assumption of risk: Court and jury:
Evidence: Mental conclusions: Statements to physician: Perma-
nency of injuries: Pleading: Instructions: Special verdict: Imma-
terial errors: New trial: Newly discovered evidence.*

1. Incompetency of a sawyer may arise from mere lack of practice for
   several years as well as from never having operated a saw carriage
   at all.

2. Plaintiff, after working one night in defendant's sawmill as carriage
   rider, informed the superintendent that the sawyer was incompe-
   tent.   The next evening he went to work with the same sawyer in
   charge, in reliance, as he claimed, upon the superintendent's prom-
   ise, made that morning, to get another sawyer, and was injured
   about two hours thereafter by reason of the unskilful manner in
   which the carriage was operated.   *Held,* that under all the cir-
   cumstances it was a question for the jury whether plaintiff had
   assumed the risk arising from the incompetency of the sawyer,
   either by continuing in the employment after the lapse of a reason-
   able time for the change of sawyers to be made as promised, or
   because the danger was so great and immediate that he was not
   justified in working at all on the second evening.

3. All the facts and circumstances surrounding plaintiff at the time
   he commenced to work the second evening were admissible as
   explaining why he went to work and whether his act was rea-
   sonable; and the fact that, after having stated that he was still
   relying upon the superintendent's promise, he was permitted to
   elaborate such statement of his mental condition or conclusions
   in connection with his testimony as to the facts upon which they
   were based, is *held* not to have been prejudicial.

4. Testimony of physicians who treated plaintiff for his injuries, based
   in part upon statements as to his pains and feelings, made by him
   for the purpose of medical treatment, is *held* admissible.

5. Testimony of a physician that, so far as he was able to know, he
   would say that plaintiff's injuries were permanent, was admis-
   sible.

6. A complaint alleging that numerous injuries to plaintiff's head,
   back, and spine were received, and that "other serious injuries
   were done him," is *held* sufficient, in the absence of a motion to

Curran vs. A. H. Stange Co.

make more definite and certain, to warrant the admission of evidence that plaintiff's eyesight and hearing were impaired.

Where there was little conflict in the evidence except concerning the promise to discharge the incompetent servant, upon which question the jury were properly instructed, a refusal to instruct that they were not bound to credit the testimony of the plaintiff, even in matters where he was not contradicted by any witness, is *held* not to have been error.

8. An instruction that the jury should find a verdict upon the *preponderance* of the evidence is *held* not to have been error, where they were further told in the same connection that they should make their answers in accordance with their *conviction* or *belief*, from the evidence, as to what the truth really was.

9. The use of the word *ought* instead of *would* in a question of the special verdict as to whether the danger to plaintiff by reason of the incompetent sawyer was so great that a reasonably prudent man, under the circumstances, *ought* not to have subjected himself to it, was not an error prejudicial to defendant, where the charge of the court upon that question used the correct word, and defendant had requested the submission of a similar question in which the word *ought* was used.

10. Where the only claim of contributory negligence was that plaintiff assumed the risk, and that issue was properly submitted and determined in the special verdict, failure to submit a general question as to whether plaintiff was guilty of contributory negligence was not error.

11. In order to warrant the granting of a new trial on the ground of newly discovered evidence, it must appear that the facts upon which reliance is placed were discovered after the trial.

12. Evidence that an expert witness who had testified that he was a graduate of certain medical colleges was not a graduate of one of them would be merely impeaching evidence, and a refusal to grant a new trial on the ground that that fact was not discovered until after the former trial was therefore not error.

APPEAL from a judgment of the circuit court for Lincoln county: CHAS. V. BARDEEN, Circuit Judge. *Affirmed.*

This is an action to recover for personal injuries. The defendant owned and operated a sawmill at Merrill, Wisconsin, which had two sawing outfits upon the main floor, each of which in part consisted of what is called a saw carriage, propelled by steam feed, and running on tracks from north

to south, lengthwise of the mill. The plaintiff was employed on the 5th of August, 1895, to act as "carriage rider" on the west carriage and upon the night force. He went to work at 6 o'clock that night, it being the first night that this carriage was operated for the season. The force which ran each carriage was composed of three men,— a sawyer, a setter, and a carriage rider. The sawyer stood on the floor of the mill west of the carriage, and had two levers in front of him, one of which was used to start, operate, and control the saw carriage, and one was to operate what is called a "steam nigger," which rolls logs from the log deck to the carriage. The sawyer has complete control of the movements of the carriage, which he runs back and forth upon the tracks at great speed, by letting steam into the cylinder.

The duties of the setter were to stand upon the carriage near the north end, and, by means of a lever, to set the log at the proper distance from the saw, so that the lumber made as the log passed the saw would be of the proper thickness, and also to assist in dogging and undogging the logs. The carriage rider's duties were to assist in rolling the logs from the log deck to the carriage and to fasten the same by the dog levers. Both the carriage rider and the setter rode upon the carriage all the time, but had no means of controlling its movements except by signals to the sawyer.

Upon the night when the plaintiff went to work one Brown was the sawyer and one Dickenson was the setter. The plaintiff did not know Brown personally. The evidence shows that the position of sawyer is one requiring great skill and experience, and that Brown had been a sawyer in several mills for several years up to the year 1891, but since that time had done no work as a sawyer. The saw carriage was operated by these three men during the night, and the plaintiff's testimony tends to show that Brown was unable to handle the saw carriage as it should be handled; that he found it difficult, if not impossible, to stop it at the right

points; and that it bumped frequently at the bumpers, and that it gigged back and forth, making it hard for the setter and rider to do their work.

One Elsen was the superintendent of the mill, and employed the entire crew, and was present during the night in question for a considerable time, and saw how the carriage was operating. Upon quitting work in the morning the plaintiff claims that he complained to Elsen of Brown's incompetency, and that Elsen said he guessed Brown couldn't saw, and that he would fire him, and put one Fowler on as sawyer. Elsen's testimony is to the effect that *Curran* complained of Brown, and said that he was afraid of him, and that he (Elsen) said: "Do not be afraid of him. He is supposed to be a good man, and if he don't make it I will get some one who will. I may get Fowler." Fowler was the setter upon the other carriage.

The evidence further shows that the plaintiff went home and slept that day, and returned to work in the evening, and found Brown again acting as sawyer and Dickenson as setter, but that the superintendent was not there, and that Fowler was still doing the setting upon the other carriage. The plaintiff went to work, thinking, as he claims, that probably Elsen had been unable to find any one to take Fowler's place as setter, and hence that the change had not been made on this account, but still relying upon the promise to change. About an hour after the work commenced Fowler was called away, and the day setter put in his place, and the plaintiff testifies that he thought this indicated that the change would soon be made.

About two hours after work commenced the plaintiff's saw carriage was gigged back to the log deck, and stopped, in order to turn the log. Thereupon the plaintiff undogged the log, and, being slippery, it rolled from the saw carriage onto the log deck. At this moment Brown, the sawyer, saw that his lever which controlled the carriage was not

standing straight, as it should when the carriage was at rest, and he took hold of it to straighten it, and in so doing pulled the lever too far, and let on the steam, and the carriage started suddenly south, and went on to the end of the track.   The plaintiff, being on the north end of the carriage, was thrown off between the tracks, by the sudden start, and fell down into a chute for conveying the refuse below, and between the tracks, and was severely injured.

The negligence claimed by the plaintiff was in the hiring of an incompetent sawyer, known to be such.

The jury returned the following special verdict: (1) Did the defendant use such care in selecting and hiring Brown to act as sawyer as the majority of sawmill owners or superintendents would have used under the same or similar circumstances?  *Answer.* No.  (2) Was Brown a competent sawyer when the defendant hired him, in August, 1895?  *A.* No.  (3) Was Brown a competent sawyer at the time of the accident?  *A.* No.  (4) If Brown was an incompetent sawyer at the time of the accident, did Elsen know, or ought he reasonably to have known prior to the accident, that Brown was incompetent?  *A.* Yes.  (5) On the morning of August 6, 1895, did *Curran* complain to Elsen that Brown was an incompetent sawyer, and say to him that he would not continue longer as carriage rider with Brown as sawyer?  *A.* Yes.  (6) Did Elsen then tell *Curran* that he would discharge Brown as sawyer and employ Fowler in his place?  *A.* Yes.  (7) From all the circumstances and from the conversation which occurred between Elsen and the plaintiff on the morning of August 6, 1895, would a man of ordinary intelligence have understood therefrom that Brown would be discharged and Fowler put in his place by the time the plaintiff was to begin work again?  *A.* No.  (8) If you answer question No. 6 in the affirmative, then, under all the circumstances, did the plaintiff continue in his said employment for a longer time than was reasonable to allow defend-

Curran vs. A. H. Stange Co.

ant to discharge Brown and employ Fowler as sawyer?
*A.* No. (9) If the plaintiff's version of the conversation
which occurred between Elsen and himself on the morning
of August 6, 1895, is the true one, did the plaintiff begin
work on the night run, relying upon the promise made to
him by Elsen to discharge Brown? *A.* Yes. (10) Was the
danger to be apprehended from riding the carriage in ques-
tion, under Brown's management as sawyer, so great, imme-
diate, and constant that a reasonably prudent person, acting
in the light of all the circumstance under which plaintiff
acted, ought not to subject himself to it? *A.* No. (11) Did
a want of ordinary care on the part of Brown cause the car-
riage to start and injure the plaintiff? *A.* No. (12) Was
the injury to plaintiff caused by the want of skill or incom-
petence as a sawyer on the part of said Brown? *A.* Yes.
(13) Would the majority of mill owners or superintendents,
under the circumstances of the situation in which Elsen was
placed, have reasonably expected that the sawyer Brown, in
the exercise of ordinary care, would be likely to cause in-
jury to plaintiff by reason of his manner of handling the car-
riage upon which plaintiff was riding? *A.* Yes. (14) What
damages has the plaintiff sustained by reason of his injuries?
*A.* $5,500.

From judgment for the plaintiff on this verdict the de-
fendant appeals.

For the appellant there was a brief by *Curtis & Reid*,
attorneys, and *C. H. Van Alstine*, of counsel, and oral argu-
ment by *Mr. A. H. Reid* and *Mr. Van Alstine*. They con-
tended, *inter alia*, that the alleged promise of Elsen to remove
the sawyer and put Fowler in his place in no sense excused
the plaintiff for continuing to ride the carriage with Brown
as sawyer if Brown was the incompetent man he is claimed
to be. A wide search through manufacturing establish-
ments will reveal no position fraught with greater and more
obvious danger than one upon a log carriage in a sawmill

Curran vs. A. H. Stange Co.

with an incompetent man at the lever. It will reveal no position where the absence of a precaution for safety will so greatly increase the danger as will the substitution of an incompetent for a competent head sawyer. As a matter of law the danger was so obvious, imminent, and great that an ordinarily prudent person would not subject himself to it. There was no such thing as a reasonable time to remove the danger other than presently and before the work proceeded further. *Erdman v. Illinois Steel Co.* 95 Wis. 6, and cases cited; *Maitland v. Gilbert Paper Co.* 97 id. 476; *Indianapolis & St. L. R. Co. v. Watson*, 114 Ind. 20; *Hough v. Railway Co.* 100 U. S. 213; *Indianapolis Union R. Co. v. Ott*, 11 Ind. App. 564; *Showalter v. Fairbanks, M. & Co.* 88 Wis. 376.

For the respondent there was a brief by *Flett & Porter*, and oral argument by *W. H. Flett* and *M. C. Porter*. They argued, among other things, that it is fair to presume, under all the facts and circumstances disclosed by the evidence in the case at bar, that plaintiff, or any reasonably prudent person similarly situated, may have reasonably supposed that by the exercise of extraordinary care and watchfulness on his part he could guard against and avoid any serious danger there might be of being thrown from the carriage for the limited time he might be required to do so before Elsen would make the change of sawyers. *Maitland v. Gilbert Paper Co.* 97 Wis. 476; *Greene v. M. & St. L. R. Co.* 31 Minn. 248; *Lyberg v. N. P. R. Co.* 39 id. 15; *Lyttle v. C. & W. M. R. Co.* 84 Mich. 289; *Smith v. E. W. Backus L. Co.* 64 Minn. 447; *Jensen v. Hudson Sawmill Co., ante*, p. 73; *Dells Lumber Co. v. Erickson*, 80 Fed. Rep. 257–259.

WINSLOW, J. It is claimed that this judgment should be reversed: (1) For failure to grant a nonsuit, or, in default thereof, to direct a verdict for the defendant; (2) for errors in the admission of evidence; (3) for error in refusing to give

certain proposed instructions; (4) for errors in instructions given; (5) for error in the form of question 10 in the special verdict; (6) for failure to submit all the issues; and (7) for failure to grant a new trial. These questions will be considered in the order indicated.

1. It is claimed in the appellant's brief, although the claim was practically abandoned at the argument, that there was not sufficient testimony to show that the sawyer, Brown, was incompetent, but rather that he was out of practice, so to speak, by reason of the fact that he had not operated a saw carriage for four years. We are satisfied, however, that the evidence is amply sufficient to justify the verdict of the jury that Brown was incompetent, at the time of the accident, to handle a carriage with that skill which such work evidently requires. Whether such incompetency arises from mere lack of practice for several years, or from the fact of never having operated a carriage at all, can make no difference.

But the defendant claims that, even if the evidence was sufficient on this point, still that the plaintiff assumed the risk; that after running the first night with Brown he had ascertained Brown's incompetency; that the promise to replace Brown with another sawyer, alleged to have been made in the morning, was necessarily a promise to make that change at once; that the change not having been made when the plaintiff went to work at night, and the plaintiff knowing that fact, he could not rely upon the promise any further, but, by going to work again with Brown, assumed the risk. The further contention is made that, if Brown was incompetent, the risk which the plaintiff ran was so great and imminent that he was not justified in working at all on the second evening with Brown as sawyer, and that if he did so he voluntarily assumed the risk. Both of these propositions have been negatived by the jury, and we think there was sufficient evidence upon which the jury might rightly base

their findings.    We do not think that it can be said, as matter of law, that the risk of remaining upon the saw carriage with Brown as sawyer was so immediate and imminent that the plaintiff would be required to quit work at once or be held to have assumed the risk.    It may well be that the plaintiff thought, and that a reasonable man would think, that by exercising a little more than usual care he could perform his duties upon the saw carriage safely, notwithstanding the erratic movements of the carriage.    The case is certainly not like that of *Erdman v. Illinois Steel Co.* 95 Wis. 6, where there was a cracked saw, every revolution of which was fraught with the most imminent and deadly danger. Nor can it be considered, as matter of law, that the promise to place a new sawyer in Brown's place expired by limitation before the plaintiff went to work on the second evening. We think that it was properly a question for the jury to say whether, under all the circumstances, a reasonable time had elapsed for the change to be made at the time the plaintiff was injured.

2.  The plaintiff was asked why he went to work upon the second night, after seeing Brown there as sawyer, and replied, under objection, that he thought that Elsen had not had time to get a setter to put in Fowler's place, and that he would be there at any minute with a new setter, and then put Fowler in Brown's place, and so he went onto the carriage; that in a short time the day setter came, and took Fowler's place, and Fowler went down, stairs, and he (the plaintiff) thought that Elsen had sent for him to make some arrangement for him to do the sawing, and so he (the plaintiff) continued to work, relying upon the promise to make the change.    The admission of this evidence is claimed to be error.    The question was, on this branch of the case, whether the plaintiff was justified in working with Brown in reliance upon the promise to put in a new sawyer, and necessarily all the facts and circumstances surrounding the

Curran vs. A. H. Stange Co.

plaintiff at the time he commenced to work were properly admissible, as explaining why he went to work and whether his act was reasonable. But it is said that it was improper to allow him to state his mental conclusions upon these facts. We do not think, however, that this objection can prevail. The plaintiff certainly was entitled to state that he was still relying upon the promise. This was, in effect, the statement merely of a condition of mind or mental conclusion, and the fact that it is somewhat elaborated, in connection with the circumstances before his eyes, is not prejudicial.

Two physicians were called, who treated the plaintiff for his injuries, and who gave testimony, based in part upon the statements of the plaintiff, as to his pains and feelings, made for the purpose of medical treatment. The admission of this testimony is now claimed as error. This subject, however, was fully reviewed in *Keller v. Gilman*, 93 Wis. 9, where this class of testimony was held to be competent.

It is objected that the plaintiff's medical witnesses were allowed to guess at the character and permanency of the plaintiff's injuries. One of the physicians was asked whether, in his opinion, the plaintiff's injuries were permanent, and he answered that, so far as he was able to know, he would say they were permanent. A motion to strike out the answer was overruled. It is said that this is in violation of the rule that damages for permanent injuries can only be allowed where the evidence shows that they are reasonably certain to be permanent. *Hardy v. Milwaukee St. R. Co.* 89 Wis. 183. The objection is untenable. The fact that the jury must find reasonable certainty from all the evidence does not make it necessary that every witness must testify to the fact of reasonable certainty. The probative force of testimony to the effect that injuries are probably permanent may be weak, but weak testimony is not, on that account alone, inadmissible. There may be other evidence of facts and circumstances which supplements and strengthens it to

the necessary point of certainty.  *Crites v. New Richmond,* *ante,* p. 55.

Again, it is urged that it was error to allow plaintiff to testify that his eyesight and hearing were impaired since his injury; because no special claim of such injuries was made in the pleadings.  The complaint, after charging that numerous injuries to the head, back, and spine were received by his fall, alleges that " other serious injuries were done him." This we regard as sufficient to justify evidence of injuries other than those specifically named.  The allegation is indefinite, and probably was open to a motion to make more definite and certain, but, in the absence of any such motion, it was not error to admit evidence of injuries to the eye and ear under it.

3.  The defendant requested the following instruction, which was refused: " You are not bound, as matter of law, to credit the testimony of the plaintiff, even in matters where he is uncontradicted by any witness."  This is undoubtedly a correct legal proposition, and its refusal, under some circumstances, might well be error.  In this case, however, there seems little or nothing to which it could rightfully apply with any force.  There was really very little conflict as to matters of fact in the case, except as to the alleged promise to discharge Brown, and upon this subject the jury were properly instructed, as we shall see.  We can discover no questions in the case upon which this instruction would have been useful, and hence there was no error in the refusal to give it.

4.  But it is said that there was affirmative error in the charge upon the subject of the preponderance of the evidence.  The trial judge, after instructing the jury that they were to answer the questions according to the fair weight and preponderance of the evidence, uninfluenced by sympathy or prejudice, charged that in answering each question they should consider and review all the evidence bearing thereon

on either side, and that their answer should reflect, as near as possible, their deliberate conclusion based upon such evidence. He further charged as to the alleged promise by Elsen to discharge Brown: "Each has given his version of what was said. The burden of proof is upon the plaintiff to show, by the fair preponderance of the evidence, that such promise was in fact made, and, before you will be warranted in finding an affirmative answer to this question, you must find that the evidence preponderates in his favor; that is, in favor of the plaintiff's version. You should consider all the circumstances and surroundings, the interest, if any is shown, each witness has in the result of this suit, and make your answer in accordance *with the conviction that comes to you of what the truth really is. If you believe, and so find,* that the evidence preponderates in plaintiff's favor, and his version of what was said on the morning of August 6th *is true,* then your answer to this question should be in the affirmative. If the evidence as to what was said is evenly balanced, or you believe Elsen's version of it, then your answer should be in the negative." If the instruction to the effect that the jury should find a verdict simply upon the fair preponderance of the evidence stood alone, it seems that it would be reversible error, under rules frequently stated by this court. *Gores v. Graff,* 77 Wis. 174; *Pelitier v. C., St. P., M. & O. R. Co.* 88 Wis. 521; *Guinard v. Knapp-Stout & Co. Company,* 95 Wis. 482. There should be some instruction, in effect, that the jury are to be satisfied that the fact exists in order to justify a verdict. The charge, however, should all be construed together. In the present case, in addition to the charge that they should find a verdict upon preponderance of the evidence, the jury were plainly told, in the same connection, that they should make their answers in accordance with their conviction of what the truth really was, and that, if they *believed* that the plaintiff's version was true, they should answer in the affirmative. By these clauses they

Curran vs. A. H. Stange Co.

are told that they are to answer according to their *conviction* or *belief* from the evidence. These are fully as strong expressions as to say that they must be *satisfied* from the evidence, and they must naturally have been so understood by the jury. Taken as a whole, we do not think the charge upon this subject can be called erroneous.

A further criticism upon the charge is made to the effect that the court informed the jury what effect their answers would have upon the plaintiff's right of recovery. Examination of the charge shows that this criticism is unfounded. The court gave the jury some general instructions as to what would constitute an assumption of risk by the plaintiff, and as to the general duties of mill owners toward their employees, but nowhere told them what would be the effect of their answer to any question upon the question of the defendant's liability.

5. Question No. 10 of the special verdict reads as follows: "Was the danger to be apprehended from riding the carriage in question, under Brown's management as sawyer, so great, immediate, and constant that a reasonably prudent person, acting in the light of all the circumstances under which the plaintiff acted, ought not to subject himself to it?" It is now urged that the word "would" should have been used in the question instead of the word "ought." It is quite apparent that "would" is the strictly proper word, but was it error to use the word "ought"? We think not, for two reasons: (1) The court carefully and correctly charged the jury upon this question that if they found that the risk "was so great, immediate, and constant that a reasonably prudent man, under all the circumstances, would not have continued to ride the carriage, then it is your duty to say so by writing the proper answer to this question." (2) Substantially this same question was asked to be submitted to the jury by the defendant's counsel, with the word "ought" instead of "would" in it. While the word "ought" is in-

Curran vs. A. H. Stange Co.

accurate, it will be found frequently used in the text-books. and decisions as the proper word in this connection, and as the equivalent of "would," and we do not regard its use, under the circumstances here, as prejudicial.

6. It is urged that there should have been a general question as to whether the plaintiff was guilty of contributory negligence. We find nothing in the record to call for any such finding. The only claim made upon the trial seems to have been that the plaintiff assumed the risk, and this issue was properly submitted and determined.

7. One of the plaintiff's physicians qualified himself to testify as a medical expert by testifying that he was a graduate of both Rush and Hahneman medical colleges, in Chicago. Upon the motion for a new trial, the defendant introduced an affidavit from the president of the Rush Medical College stating that the doctor was not a graduate of that college. No affidavit to the contrary was introduced, and it is now said that a new trial should have been granted upon the ground that this was newly discovered evidence. There are two answers to this objection: (1) There is nothing to show that the fact was learned after the trial of the case closed; and (2) the evidence, at most, was merely impeaching evidence. *Hooker v. C., M. & St. P. R. Co.* 76 Wis. 542.

Upon the whole record, we have found no reversible errors.

*By the Court.*— Judgment affirmed.

BARDEEN, J., took no part.

The rights of a servant who continues work on the faith of a promise to remove a specific cause of danger are considered in a note to *Illinois Steel Co. v. Mann* (170 Ill. 200), in 40 L. R. A. 781.— REP.